IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

       Plaintiff,                     No. CIV S-05-1538 LKK GGH PS

   vs.

LISA A. BELLECCI,               FINDINGS AND RECOMMENDATIONS
MARK A. PETRIE,

       Defendants.

_____/

       Plaintiff moves for partial summary judgment against defendant Lisa Bellecci. The motion was submitted for decision on the papers by order filed August 3, 2007.  This case was referred to the undersigned pursuant to E. D. Cal. L. R. 72-302(c)(21), upon the withdrawal of defendant's counsel.  Assistant U.S. Attorney Catherine Swann[1] represents plaintiff United States; defendant Lisa A. Bellecci proceeds in pro se.

BACKGROUND

       The initial complaint was filed August 1, 2005, naming only defendant Bellecci. An amended complaint was filed September 14, 2005, naming both Bellecci and Mark Petrie.

---

[1] Previously Catherine Cerna, see Notice of Name Change filed January 16, 2008.

The operative Second Amended Complaint (hereafter "complaint" or "SAC") was filed January 11, 2006, against both defendants, whose amended answer was filed March 16, 2006.  Pretrial scheduling dates were vacated by order filed September 13, 2007, pending a ruling on the instant motion.

The complaint alleges that Bellecci and Petri unlawfully received and retained funds paid to Bellecci as the surviving spouse of a deceased military veteran during the period January 1, 1992 to February 28, 2003.  Plaintiff began receiving Dependency and Indemnity Compensation ("DIC") benefits in 1988, following the death of her husband, Christopher Bellecci, in a military training accident.  Pursuant to 38 U.S.C. § 101(3) and 38 C.F.R. § 3.50(b), such benefits are unavailable to a former spouse who remarries or has "lived with another person of the opposite sex and held . . . herself out openly to the public to be the spouse of such other person."  The complaint alleges that Bellecci has resided with, and publicly held herself out as married to, Mark Petrie since 1992.

The complaint seeks treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as well as compensatory and punitive damages, plus interest and costs, for common law fraud, unjust enrichment, and payment by mistake.  Jurisdiction is premised on 28 U.S.C. § 1345 (United States as plaintiff) and 31 U.S.C. § 3730(a) (authorizing the Attorney General to bring a civil action against a person who "has violated or is violating section 3729" (the False Claims Act)).

In their First Amended Answer to the Second Amended Complaint, plaintiffs assert the following affirmative defenses:  Statute of Limitations, pursuant to 31 U.S.C. § 3731 [False Claims Act]; Failure to State a Cause of Action; Failure to Mitigate; Unclean Hands; Latches; Waiver; and Equitable Estoppel.  None of these defenses are addressed in plaintiff's

\\\\\

\\\\\

\\\\\

1   motion for summary judgment, or in defendant's responses thereto and, accordingly, are reserved

2   for trial (see discussion, infra, including notes 2 and 4).[2]

3              The allegations of the complaint rest on a March 18, 2003 determination by the

4   Oakland Regional Office of the Department of Veterans Affairs which provided:

5          We have stopped your DIC award effective January 1, 1992.

6          You are no longer considered the surviving spouse of Mr. Bellecci for VA
           purposes because you have been living with a man and holding yourself out
7          openly to be the spouse of that man since 1992.

8          We used the following evidence to make our decision:  An investigation
           conducted by the Department of Veterans Affairs Office of Inspector General.
9
           This adjustment will result in an overpayment of benefits which have been paid to
10         you.  You will be notified shortly of the exact amount of the overpayment and
           given information about repayment.
11

12  (First) Decl. of Phyllis Farrell, Exh. A.

13  \\\\\

14  _____

15         [2]  It is the opinion of the undersigned that Bellecci has made a prima facie showing she
    may have been misled by the Veterans Administration and denied information critical to this
16  proceeding.  Defendant has submitted a February 1, 1996 letter she received from a VA
    Adjudication Officer requesting verification of Bellecci's marital status pursuant to "VA Form
17  21-0537 (May 1994)."  The letter does not mention the "holding out" exception to eligibility
    pivotal in this case, but states only, "Generally, a surviving spouse's entitlement to DIC ends
18  with marriage. You are responsible for reporting any change in your marital status."  The
    accompanying form asks merely, "Have you remarried since the death of the veteran?" which
19  defendant truthfully answered, "No."  Defendant's Memorandum, Exh. 3-O.
           Additionally, in early November 2005, after this case was filed August 1, 2005, defendant
20  and her attorney requested from the VA Oakland Regional Office and national Office of
    Investigations, Inspector General, "a complete copy of all records in your possession including
21  but not limited to documents which pertain to my application for, receipt of, and deposit of
    surviving spouse benefits including all documents submitted to me, signed by me, and executed
22  on my behalf as well as any and all documents pertaining to eligibility reporting requirements
    including but not limited to eligibility verification reports." Id.., Exh. 3-P.  On January 9, 2006,
23  the Director of the Operational Support Division, VA Office of Inspector General, denied the
    request, stating in pertinent part (ibid.): " This case has not officially closed.  Therefore, we are
24  citing FOIA exemption 7A to withhold any accumulated documentation in this file at this time.
    Exemption 7A authorizes the withholding of records or information compiled for law
25  enforcement purposes but only to the extent that release of the information could reasonably be
    expected to interfere with enforcement proceedings.  We will respond further to your request
26  when this case is closed."  It is unclear whether the VA has yet released all relevant
    documentation.

The underlying investigation by the Department of Veterans Affairs Office of Inspector General ("OIG") commenced in September 2002.  As recounted by Carole Lehman, the OIG Special Agent who investigated this case:

> On or about September 16, 2002, two witnesses, one who had known Bellecci for three years, and the other a family member, told me that:  Bellecci and Petrie started dating sometime in the early 1990's, the two started a real estate business together in Vallejo, CA, Bellecci and Petrie owned several pieces of property together, the two had four children together, and Bellecci had told family members that she and Petrie will not get married because she would lose her VA benefits.  Even though these witnesses also informed me of a legal dispute between themselves and Bellecci, the witnesses and the subject testimony were credible in my judgment.

Lehman Decl. at ¶ 4.  Pursuant to this information, Agent Lehman initiated the underlying investigation, id. at ¶ 5 et seq., and forwarded the information to the Veterans Affairs Post-Determination Team.  As described by Post-Determination Team Coach Phyllis Farrell:

> On or about March 17, 2003, Post-Determination received information from the Department of Veteran's Affairs, Office of Inspector General, that:
>
>> Bellecci admitted in a sworn deposition for an unrelated investigation, that she has been living with Mark Petrie since 1992.  She and Mark have four children together who all go by the name "Petrie."  Furthermore, Bellecci and Petrie mutually own a real estate business and own various properties together in the name of "Mark and Lisa Petrie."  According to individuals who requested anonymity, Bellecci has been heard saying on numerous occasions to family members that she and Petrie will not get married because she would lose her VA benefits.

First Farrell Decl. at ¶ 2; Lehman Decl. at ¶ 9 (referenced Exhibit E is not included in exhibits).  Based on this information, the Post-Termination team concluded that Bellecci had ceased qualifying for benefits as a surviving spouse under 38 U.S.C. § 101(3) and 38 C.R.F. § 3.50, as of January 1, 1992, and should be required to repay the government the amount of DIC benefits she had been paid after that date.  Id. at ¶¶ 2, 3.  That amount was estimated upon the filing of this action to be $112,056, for the period January 1, 1992 to February 28, 2003.  Complaint, ¶ 17; SAC, ¶ 22.  But see, Plaintiff's Memorandum, at p. 15 (seeking $110,082 plus interest).

\\\\\\

In its March 18, 2003 letter, the Oakland Regional Office informed Bellecci that she had one year within which to appeal the VA's decision, citing "VA Form 4107, 'Your Rights to Appeal Our Decision.'"[3] First Farrell Decl., Exh. A.  However, Bellecci did not seek to exercise her appeal rights until April 6, 2004.  Id., Exh. B ("Notice of Disagreement" letter sent to VA by Bellecci's attorney).  As a result, "[t]he VA did not consider this appeal because it was untimely."  Id. at ¶ 6.

Thereafter, "[o]n April 23, 2003, an agent of the Department of Veterans Affairs supplied the United States Attorney with documents presenting 'facts material to the right of action' against defendant.  31 U.S.C. § 3731(b)(2).  The United States Attorney is the 'official of the United States charged with the responsibility to act in the circumstances.'  Id."  SAC, ¶ 23.  The United States filed this action on August 1, 2005.[4]

---

[3]  These appeal rights include the right to seek review by the Board of Veterans' Appeals, the Court of Appeals for Veterans Claims, and the Federal Circuit Court of Appeal.  See, e.g., 38 U.S.C. §§ 7104, 7252, 7266, 7291.

[4]  The United States alleges in its complaint that it filed this action within the three-year limitations period of the False Claims Act, 31 U.S.C. § 3731(b)(2), a matter challenged by defendant's affirmative defenses.  The court ventures no opinion on this matter nor whether the narrowed claims presented by the instant motion (mistake of fact and unjust enrichment) may be construed as quasi-contractual claims brought within the limitation periods of 28 U.S.C. § 2415 (complaint must be filed "within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later").  See, e.g., U.S. v. Neidorf, 522 F.2d 916, 918-919 (9th Cir. 1975) (history of § 2415); U.S. v. State of California, 932 F.2d 1346, 1350 -1351 (9th Cir. 1991), aff'd, U.S. v. California, 507 U.S. 746, 113 S.Ct. 1784 (1993) ("28 U.S.C. § 2415 does not . . . provide a cause of action.  It merely provides for a six year time period during which the United States may sue under quasi-contract. . . . [T]he United States must have become entitled to a claim and have acquired a cause of action before it comes under the umbrella of 28 U.S.C. § 2415." (Citation and internal quotation omitted)); U.S. v. Limbs, 524 F.2d 799, 802, fn. 3 (9th Cir. 1975) ("The six-year limitation would apply to all types of contracts, express or implied in law or in fact.  This wording is intended to include quasi-contracts involving unjust enrichment wherein the debtor receives money from the Government to which he is not entitled, regardless of whether the payment is made pursuant to agreement or as a gratuity." (Citations omitted.)).  Cf., cases decided before 1966 enactment of § 2415 which found no limitations period, e.g., U.S. v. Wurts, 303 U.S. 414, 416, 58 S. Ct. 637, 638 (1938) ("Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time"), citing Grand Trunk Western Railway Co. v. U.S., 252 U.S. 112, 121, 40 S. Ct. 309, 312 (1920) ("It matters not how long a time elapsed before the error in making the overpayment was discovered or how long the attempt to recover it was deferred.  The statute of limitations does

1    The instant motion seeks summary judgment on only plaintiff's claims for unjust

2  enrichment and payment under mistake of fact (Counts III and IV of the Second Amended

3  Complaint), against defendant Bellecci only.[5]  Plaintiff does not move for summary judgment on

4  its claims under the False Claims Act or common law fraud, which require knowing or reckless

5  material misrepresentations (see, e.g., 31 U.S.C. § 3729), in contrast to the lower scienter

6  thresholds for mistake of fact and unjust enrichment.

7    Significantly, the United States now seeks judgment for the time period

8  commencing February 14, 1997[6] to February 28, 2003,[7] for repayment in the amount of $63,597

9  plus interest.  See Plaintiff's Reply to Defendant's Opposition, at p. 5; see also, Plaintiff's

10  Second Statement of Undisputed Facts, and Second Declaration of Phyllis Farrell.

11  SUMMARY JUDGMENT STANDARDS

12    Summary judgment pursuant to Fed. R. Civ. P. 56 avoids unnecessary trials in

13  cases with no disputed material facts.  See Northwest Motorcycle Ass'n v. United States Dep't of

14

15  not ordinarily run against the United States and would not present a bar to a suit for the
   amount.").

16

17    [5]  The United States is not moving for summary judgment against defendant Petrie, who
   filed bankruptcy in the Eastern District of California on May 15, 2007.  11 U.S.C. § 362.
18  Plaintiff states, "A search for bankruptcy court filings in the Eastern District of California under
   the names Lisa Bellecci and Lisa Petrie conducted on June 7, 2007 showed no filings under
19  either name."  Plaintiff's Notice of Motion for Partial Summary Judgment, p. 1, fn. 1.

20    [6]  Throughout plaintiff's documents filed August 1, 2007, the United States references
   February 14,1997 as the new date upon which it seeks a finding that Bellecci began holding
21  herself out as the spouse of Mark Petrie.  Plaintiff's briefing contains a single deviation – the
   heading provided on page 4 of plaintiff's Reply, that "Bellecci held herself out as the spouse of
22  Petrie as a matter of law, conservatively speaking, beginning on March 1, 1997," which this court
   disregards as an insignificant inconsistent statement.

23    [7]  As in the preceding footnote, there exists one inconsistency in plaintiff's briefing
   regarding the closing date for the period of payments for which repayment is sought.  In its
24  Second Statement of Undisputed Facts, at page 4, plaintiff seeks repayment "through termination
   of benefits on approximately March 18, 2003."  However, as set forth in the declaration of Carole
25  Lehman, at page 4, paragraph 10, "Bellecci's benefits were terminated following payment for the
   month of March, 2003, which payment was made to Bellecci on or about February 28, 2003."
26  Accordingly, the requested closing date shall remain February 28, 2003.

Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.

Ct. 2505, 2512 (1986).  Two steps are necessary.  First, according to the substantive law, the

court must determine what facts are material.  Second, in light of the appropriate standard of

proof, the court must determine whether material factual disputes require resolution at trial.  See

id. at 248, 106 S. Ct. 2510.

When the opposing party has the burden of proof on a dispositive issue at trial, the

moving party need not produce evidence which negates the opponent's claim.  See e.g., Lujan v.

National Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 3187 (1990).  When the opposing

party has the burden of proof, the moving party need only point to matters which demonstrate the

absence of a genuine material factual issue.  See Celotex v. Cattret, 477 U.S. 317, 323-24, 106 S.

Ct. 2548, 2553 (1986).

If the moving party meets its burden, the burden shifts to the opposing party to

establish genuine material factual issues.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).[8]  The opposing party must demonstrate that

disputed facts are material, i.e., facts that might affect the outcome of the suit under the governing

law, see Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; T.W. Elec. Serv., Inc. v. Pacific Elec.

Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are genuine, i.e., the

parties' differing versions of the truth require resolution at trial, see T.W. Elec., 809 F.2d at 631.

The opposing party may not rest upon the pleadings' mere allegations or denials, but must present

\\\\\

---

[8]  The nonmoving party with the burden of proof  "must establish each element of his claim with significant probative evidence tending to support the complaint."  Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted).  A complete failure of proof on an essential element of the nonmoving party's case renders all other facts immaterial, and entitles the moving party to summary judgment.  Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

1   *evidence* of specific disputed facts.  See <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. 2510.[9]  Conclusory

2   statements cannot defeat a properly supported summary judgment motion.  See <u>Scott v.</u>

3   <u>Rosenberg,</u> 702 F.2d 1263, 1271-72 (9th Cir. 1983).

4         The court does not determine witness credibility.  It believes the opposing party's

5   evidence, and draws inferences most favorably for the opposing party.  See <u>Anderson</u> at 249, 255,

6   106 S. Ct. at 2510-11, 1513.  Inferences, however, are not drawn out of "thin air," and the

7   proponent must adduce evidence of a factual predicate from which to draw inferences.  <u>American</u>

8   <u>Int'l Group, Inc. v. American Int'l Bank</u>, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J.,

9   dissenting) (citing <u>Celotex</u>, 477 U.S. at 322, 106 S. Ct. at 2552).

10         If reasonable minds could differ on material facts at issue, summary judgment is

11   inappropriate.  See <u>Warren v. City of Carlsbad</u>, 58 F.3d 439, 441 (9th Cir. 1995).  On the other

12   hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

13   nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587, 106 S. Ct.

14   1356 (citation omitted).  In that case, the court should grant summary judgment.

15   <u>DISCUSSION</u>

16      A.  <u>Partial Summary Judgment</u>

17         While plaintiff seeks partial summary judgment on the express rationale it is

18   moving against only one defendant on only two causes of action, a partial ruling is also

19   appropriate based on plaintiff's failure to address or attempt to defeat defendants' affirmative

20   defenses.  <u>Cf.</u>, e.g., <u>F.D.I.C. v. Giammettei</u>, 34 F.3d 51, 54 (2nd Cir. 1994), citing, inter alia,

21   <u>Celotex</u>, 477 U.S. at 325 (legal sufficiency of an affirmative defense, on which defendant bears

22   burden of proof at trial,  may be challenged on motion for summary judgment by plaintiff

23   demonstrating there is an absence of evidence to support an essential element of defendant's

24

25       [9]  A verified complaint may be used as an affidavit in opposition to the motion.

26   <u>Schroeder v McDonald</u>, 55 F. 3d 454, 460 (9th Cir. 1995); <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam).

1   theory).  The initial burden lies with the moving party even when the issue is one on which the

2   non-moving party will bear the burden of proof at trial.  Russ v. International Paper Co., 943 F.2d

3   589, 592 (5th Cir. 1991).  Since plaintiff has addressed none of plaintiff's affirmative defenses,

4   the merit of these claims remains for determination at trial.  See fns. 2 and 4, supra.  This court's

5   narrow role is to assess only whether Bellecci continued to meet the "surviving spouse" criteria of

6   38 U.S.C. § 101(3) and 38 C.F.R. § 3.50(b), for the time period commencing February 14, 1997

7   and, if not, whether she is obligated to make repayment to the Veterans Administration under the

8   theories of mistake of fact and unjust enrichment.

9       B.  Liability and Recovery Theories

10          1.  Mistake of Fact

11          The United States may recover payments made under an erroneous belief that was

12   material to the decision to pay, even if the payments were innocently received.  See United States

13   v. Mead, 426 F.2d 118, 124 (9th Cir. 1970).  In Mead, the Ninth Circuit relied on established law

14   articulating the "common law doctrine of payment by mistake," characterized as both a theory of

15   recovery and remedy uniquely "available to the United States and [] independent of statute."

16   Ibid., citing U.S. v. Wurts, 303 U.S. 414, 416, 58 S. Ct. 637, 638 (1938) (recovery permitted of

17   erroneous refund of taxes, noting that "[t]he Government's right to recover funds, from a person

18   who received them by mistake and without right, is not barred unless Congress has 'clearly

19   manifested its intention' to raise a statutory barrier") (fn. omitted) ; cf., Kingman Water Co. v.

20   U.S., 253 F.2d 588, 590 (9th Cir. 1958) (government uniquely entitled to seek money paid under

21   mistake of law); United States v. Howell, 9th Cir., 318 F.2d 162 (9th Cir. 1963) (U.S. permitted to

22   rely on common law contract principles to state cause of action against military base

23   concessionaires); and United States v. Borin, 209 F.2d 145 (5th Cir. 1954) (U.S. permitted to rely

24   on common law fraud remedies to recover subsidy payments illegally collected by livestock

25   slaughterer).

26   \\\\\

9

1    The Mead court emphasized that recovery was appropriate even if the payments

2    were received without knowledge of their inappropriateness.  "Knowledge of falsity is not a

3    requisite for recovery under the mistake doctrine."  Mead, 426 F. 2d at 125, fn. 6.  In Mead, the

4    government was authorized under the Agricultural Conservation Program to make payments to

5    farmers for the "actual cost" of qualifying conservation projects; the government mistakenly made

6    payments to Mead and other farmers pursuant to vouchers setting forth the "true value" rather

7    than "actual cost" of the projects.  After finding that the actions of the farmers did not meet the

8    intent requirements of the False Claims Act, the court noted that recovery is nonetheless possible

9    under a mistake of fact theory (id. at 124-125, fn. omitted):

> As the one into whose hands the mistaken payments flowed, Mead is liable to the
> government for each of the mistaken over-payments.  Since Mead was the active
> force in obtaining the payments and directly received the benefits of the payments,
> he now must return that portion of the total of the payments which was made by
> mistake.  The other appellees are liable for the mistaken payments because they
> signed the aid applications and because Mead purported to act in their behalf and
> they received benefits as a result of the transaction.  Wisconsin Central Railroad
> Co. v. United States, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399 [1896]; United States
> v. City of Philadelphia, E.D.Penn., 50 F.Supp. 170 [1943]; See RESTATEMENT
> (SECOND) OF AGENCY Sections 104, 141.  As applicants for governmental aid,
> these appellees may not insulate themselves from personal responsibility for
> compliance with the requirements and conditions of the regulations pertinent to
> their applications.  Having received the object of their aid applications in the form
> of completed conservation projects, they are individually liable (and jointly liable
> with Mead) for that portion of the aid payments on their own projects which was
> obtained by mistake.

19   See also, United States v. Horton, 622 F.2d 144, 145 (5th Cir.1980); United States v. Clawson

20   Medical Rehab. and Pain Care Ctr., 722 F.Supp. 1468, 1469 (E.D. Mich.1989); United States v.

21   Bushman, 661 F.Supp. 266, 267 (E.D. Mo.1987) (each a government recoupment action to

22   recover Medicare overpayments).

23   Similarly, plaintiff asserts herein, "the United States was mistaken as to Bellecci's

24   status as a 'surviving spouse' under the applicable statutory definition.  Accordingly, the United

25   \\\\\

26   \\\\\

10

States is entitled to adjudication against Bellecci as a matter of law under mistake of fact."[10] Plaintiff's Memorandum, at p. 14.  Under this theory, Bellecci is imputed with full knowledge of the statutory and regulatory requirements for maintaining her eligibility to receive DIC benefits, regardless of her actual knowledge.  On this basis, absent a meritorious affirmative defense, if undisputed facts demonstrate that Bellecci no longer met the objective criteria for receiving DIC benefits as a "surviving spouse," as defined by U.S.C. § 101(3) and 38 C.F.R. § 3.50(b), plaintiff is entitled to judgment as a matter of law.

### 2. Unjust Enrichment

Plaintiff contends Bellecci was unjustly enriched by receiving monetary benefits from the United States to which she was not entitled, and should therefore be required, "in equity and good conscience" to repay the amount unjustly received.  SAC, ¶¶ 36-38; Plaintiff's Memorandum, at 14.  Plaintiff relies exclusively on California law to advance its unjust enrichment theory of recovery.

However, federal common law supports reimbursement of federal monies improperly paid pursuant to federal programs.  See, e.g., U.S. v. Independent School Dist. No. 1 of Okmulgee County, 209 F.2d 578, 580-581 (10th Cir. 1954) (rejecting subordination of federal rights to state law despite disbursement of federal money through local school lunch programs, reasoning that whether "the asserted remedy be for money had and received or restitution for unjust enrichment, the right to recover under controlling federal law is plain"); accord, U.S. v. State of California, 932 F.2d 1346, 1349-1350 (9th Cir. 1991), aff'd, U.S. v. California, 507 U.S. 746, 113 S.Ct. 1784 (1993) (state law applies only, inter alia, in the absence of a controlling

---

[10] This motion marks a retraction of plaintiff's allegations that Bellecci was intentionally deceptive.  For example, the Second Amended Complaint describes Bellecci's "receipt and acceptance" of benefits checks through direct deposit as "false claims for payment" (id., ¶ 16), and her writing of checks and making other withdrawals against these deposits as "false claims submitted for payment" (id. ¶ 17), based on Bellecci having "knowingly and falsely certified that the information forming the basis of [her eligibility] was accurate and in accordance with the requirements. . . ." (id., ¶ 21).

1  federal program or interest, or applicable federal common law, citing "classic cases of unjustment

2  enrichment" and quasi-contract liability under federal common law where refund to government

3  was clearly warranted, e.g., "<u>United States v. Limbs</u>, 524 F.2d 799, 801 (9th Cir.1975) (refund

4  sought for portion of federal workman's compensation benefits paid for which defendant had

5  received double recovery); <u>United States v. DeKalb County</u>, 729 F.2d 738, 740 (11th Cir.1984)

6  (U.S. mistakenly paid double assessments on the same property)," 932 F.2d at 1350.[11]

7          Nonetheless, California's common law theory of unjust enrichment is appropriate

8  as a vehicle for obtaining restitution as a federal remedy.  "[W]hen the federal government

9  disburses its funds or pays its debts, it does so in the exercise of a constitutional power or

10  function, and [] the rights and duties incident to the exercise of that power have their roots in the

11  federal law, and federal law controls.  In the absence of applicable federal statutes, the federal

12  courts fashion the remedies for the rights from the body of 'federal common law.'  And in the

13  fashioning of those remedies, state law is applicable only insofar as it is deemed appropriate as a

14  basis for the federal remedies."  <u>U.S. v. Independent School Dist. No. 1 of Okmulgee County</u>, 209

15  F.2d 578, 580 (10th Cir. 1954) (citations and internal quotations omitted).  "Unjust enrichment is

16  not a cause of action under California law.  It is, in fact, a general principle, underlying various

17  legal doctrines and remedies, that one person should not be permitted to unjustly enrich himself at

18  the expense of another, but should be required to make restitution of or for property or benefits

19  received, retained, or appropriated, where it is just and equitable that such restitution be made, and

20  where such action involves no violation or frustration of law or opposition to public policy, either

21  directly or indirectly."  <u>In re Wright</u>, 355 B.R. 192, 208-209 (C.D.Cal. 2006).  "Unjust enrichment

22  is basic to the subject of restitution, and is indeed approached as a fundamental principle thereof.

23

24          [11]  <u>See also</u> <u>Evans v. Safeco Life Ins. Co.</u>, 916 F.2d 1437, 1439-40 (9th Cir. 1990)
   (interpretation of contacts created under federal statute to be governed by federal common law);

25  however, where a single federal rule is not required, issues of federal common law may be
   decided by resort to the law of the state in which the suit arose.  <u>Atchison, Topeka and Santa Fe</u>

26  <u>Ry. Co. V. Brown & Bryant, Inc</u>, 159 F.3d 358, 362 (9th Cir. 1997).

1    They are usually linked together, and restitution is frequently based upon the theory of unjust

2    enrichment.  However, although unjust enrichment is often referred to or regarded as a ground for

3    restitution, it is perhaps more accurate to regard it as a prerequisite, for usually there can be no

4    restitution without unjust enrichment."  66 Am. Jur. 2d Restitution and Implied Contracts § 8 (fns.

5    and case citations omitted).

6         As plaintiff acknowledges, under California law, restitution may apply without

7    regard to the recipient's "innocence," provided he or she had "knowledge of the circumstances

8    giving rise to an unjust enrichment claim."  First Nationwide Savings v. Perry, 11 Cal. App. 4th

9    1657, 1663-1664 (6th Dist. 1992) .  While "innocent recipients may be treated differently than

10   those persons who acquire a benefit with knowledge," "restitution may be required when the

11   person benefitting from another's mistake knew about the mistake and the circumstances

12   surrounding the unjust enrichment."  Id. at 1664.  Accordingly, under the mistake of fact theory,

13   repayment is appropriate even if Bellecci was unaware of the requirements for maintaining her

14   benefits or, stated differently, because her continuing receipt of government benefits was

15   conditioned on her imputed knowledge of, and adherence to, pertinent eligibility criteria.

16        3.  Prejudgment Interest

17        Plaintiff also relies on state law to support its contention the United States is

18   entitled to prejudgment interest at the rate of seven percent.  Plaintiff cites Cal. Civil Code §

19   3287(a),[12] which provides for prejudgment interest on damages, which restitution is not.  Plaintiff

20   may be entitled to prejudgment interest.  Federal cases in which restitution was awarded pursuant

21   to statute have allowed such interest.  United States v. Gordon, 393 F.3d 1044, 1059 (9th Cir.

22

23        [12]  Cal. Civil Code § 3287(a) provides: "(a) Every person who is entitled to recover
24   damages certain, or capable of being made certain by calculation, and the right to recover which
     is vested in him upon a particular day, is entitled also to recover interest thereon from that day,
     except during such time as the debtor is prevented by law, or by the act of the creditor from
25   paying the debt. This section is applicable to recovery of damages and interest from any such
     debtor, including the state or any county, city, city and county, municipal corporation, public
26   district, public agency, or any political subdivision of the state."

1   2004) (criminal restitution); Motrola Inc. v. Fed. Express Corp., 308 F.3d 995, 997 (9th Cir.

2   2002).  To the extent that state law serves as guidance, California courts routinely award

3   prejudgment interest on restitution if the amount is reasonably certain at the time suit is filed.  See

4   e.g., Cal. Housing etc. v. Cal. Mgn. Etc, 148 Cal. App. 4th 682, 56 Cal. Rptr. 3d 92 (2007).

5   Because, the benefits allegedly overpaid here are subject to calculation as a sum certain,

6   prejudgment interest is properly awarded under state law.  Similarly unavailing is plaintiff's

7   citation to Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 728 (2nd Dist. 2000), an unjust

8   enrichment case brought by a private company against a bank for failing to honor a letter of credit,

9   wherein the Court of Appeal affirmed the trial court's judgment, which included prejudgment

10  interest, without discussion on the latter.  The case is of no precedential value here and the

11  equities that apply in a commercial setting are not readily transferable to a case involving

12  overpayment of federal benefits.  Also unavailing is plaintiff's citation to Michelson v. Hamada,

13  29 Cal.App.4th 1566 (2nd Dist. 1994) (cited for the proposition that the constitutional rate of

14  seven percent applies in the absence of a contractual or statutory rate).  That case involved actions

15  for fraud, breach of contract and breach of fiduciary duty, and resulted in an award of damages

16  which, as previously noted, restitution is not.

17          Accordingly, the court will recommend that prejudgment interest be awarded if and

18  when a verdict is rendered against defendants.

19      C.   The "Holding Out" Bar to Benefits Eligibility

20          Pursuant to 38 U.S.C. § 101(3)[13] and 38 C.F.R. § 3.50(b),[14] DIC benefits are no

21  _____

22      [13]  38 U.S.C. § 101(3) defines "surviving spouse" for these purposes as "a person of the
    opposite sex who was the spouse of a veteran at the time of the veteran's death, and who lived
23  with the veteran continuously from the date of marriage to the date of the veteran's death . . . and
    who has not remarried or (in cases not involving remarriage) has not since the death of the
24  veteran, and after September 19, 1962, lived with another person and held himself or herself
    openly to the public to be the spouse of such other person."

25      [14]  38 C.F.R. § 3.50(b) provides in pertinent part: "Surviving spouse" "means a person of
    the opposite sex . . . who was the spouse of the veteran at the time of the veteran's death and:  (1)
26  Who lived with the veteran continuously from the date of marriage to the date of the veteran's

1    longer available to a surviving spouse who remarries or has "lived with another person of the

2    opposite sex and held . . . herself out openly to the public to be the spouse of such other person."[15]

3              Bellecci does not dispute that she has lived with Mark Petrie during all relevant

4    times; the parties dispute whether Bellecci "held herself out openly to the public to be the spouse

5    of" Mark Petrie.

6              As the United States acknowledges, "case law in this area is sparse."  Plaintiff's

7    Memorandum, at 7.  In fact, plaintiff has cited but one case that only tangentially construes the

8    statutory "holding out" language, and this court has found no others.  Plaintiff also relies on the

9    Congressional intent, and reasonable inferences thereto, expressed in support of the 1962

10   amendment to § 101(3), which added the "holding out" factor.  "[I]f the intent of Congress is

11   clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

12   unambiguously expressed intent of Congress."  Chevron U.S.A., Inc. v. Natural Resources

13   Defense Council, Inc., 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781 (1984).[16]

14              The 1962 amendment broadened the then existing "remarriage bar" (maintaining

15   benefits provided the surviving spouse "has not remarried (unless the purported remarriage is

16   void)," to the following:  "has not remarried or (in cases not involving remarriage) has not since

17   the death of the veteran . . . lived with another man and held herself out openly to the public to be

18

19   death . . . ; and (2) . . . has not remarried or has not since the death of the veteran and after
     September 19, 1962, lived with another person of the opposite sex and held himself or herself out
20   openly to the public to be the spouse of such other person."

21        [15]  Cf., 38 U.S.C. § 103 (3) and 38 C.R.F. § 3.55, permitting restoration of surviving
     spouse status upon termination of a remarriage or marital-type relationship.
22

23        [16]  "In interpreting a [statutory] provision, we look first to the plain language of the
     statute, construing the provisions of the entire law, including its object and policy, to ascertain
24   the intent of Congress.  If the provision is ambiguous, we consult the legislative history. [Only]
     [w]here Congressional intent remains unclear, courts should defer to a reasonable agency
25   interpretation of a statutory scheme the agency is entrusted to administer."  Yang v. California
     Dept. of Social Services, 183 F.3d 953, 958 (9th Cir. 1999) (citations and internal quotations
26   omitted).  However, "[t]he judiciary is the final authority on issues of statutory construction."
     Chevron, supra, 467 U.S. at 843, fn. 9.

1    the wife of such other man."  Public Law 87-674, 76 Stat. 558 (1962).  The language of the statute

2    was later amended to be gender neutral.

3            In support of the 1962 amendment to § 101(3), the Senate Committee on Finance

4    noted prior abuses by surviving spouses (i.e., "widows," as the statute was then limited), as

5    follows:  "In some cases, in order to avoid the 'remarriage' bar to payment of widow's benefits,

6    women have entered into illicit relationships with men, holding themselves out to the public to be

7    their wives, while drawing benefits as the widow of a veteran."  1962 U.S.C.C.A.N. 2589, 2592.

8    Noting difficulties in the administrative application of the former "remarriage bar" – viz., (1) the

9    administrative presumption of remarriage based upon (a) cohabitation, (b) "holding out" to the

10   community as husband and wife, and (c) general reputation in the community; (2) the

11   administrative burden upon widows to rebut the remarriage inference by clear and convincing

12   evidence; and (3) an exception to the remarriage bar due to legal impediment – the Senate

13   Committee found the proposed revisions would promote a fairer and more consistent application.

14   Id. at 2592-2593.

15           Only two comments provide guidance to the Committee's understanding of the

16   "holding out" language.  First, referring to the administrative presumption of remarriage based on

17   a couple's "holding out," the latter was described as "[a] 'holding out' by the two persons to the

18   general community in which they reside that they are husband and wife (which generally is

19   embraced in . . . cohabitation)."  Id. at 2592.  However, today cohabitation is no longer held to

20   "embrace" the statute's "holding out" requirement because the factors are now set forth in the

21   disjunctive and each must be established.  See, e.g., Tillema v. Long, 253 F.3d 494, 499-500 (9th

22   Cir. 2001) (terms connected by the disjunctive should be given separate and distinct meanings

23   unless the context dictates otherwise).  Thus, "holding out" requires more than cohabitation.

24           The second relevant comment of the Senate Committee is the following:  "A

25   relationship which is secretive, or which consists of occasional short interludes (such as overnight

26   or over a weekend), or which is otherwise ostensibly illicit in nature is not considered within the

1    scope of the proposed statutory restriction." Id. at 2593.  Thus, holding oneself out "openly to the

2    public" to be another's spouse requires a relationship that is intimate, ongoing and nonsecretive.

3            Plaintiff offers the further observation, based on the decision rendered in Dela Cruz

4    v. Principi, 15 Vet. App. 143, 144-147 (2001), that a finding of "holding out" is proper even

5    where there exists a legal impediment to marriage, specifically, where the surviving spouse is

6    living with a person who remains married to a third party.  This decision marked the end of the

7    prior exception to the remarriage bar where remarriage presented a legal impediment or

8    impossibility.  Moreover, it is clear from the initial Board decision on the matter (affirmed in

9    substance in its clarified and expanded form) that the "holding out" requirement may even be met

10   by a relationship in which the parties retain separate residences but spend several days and nights

11   together each week[17] in "a marital relationship," "liv[ing] together as 'husband and wife,'"

12   "maintain[ing] a spousal relationship," "act[ing] and behav[ing] like a married couple,"

13   "performing the duties of a [spouse]," and "liv[ing] in a common law marriage-type relationship."

14   See generally, Dela Cruz v. West, 16 Vet. App. 162 (1998).  Thus, even the perception of third

15   parties that a couple is not married and does not intend to marry will not necessarily defeat the

16   "holding out" bar to benefits eligibility.

17           These factors, in combination with the statute's legislative history, are instructive

18   in shaping the contours of the "holding out" requirement.  A couple need not intend to marry, but

19   their cohabitation must be intimate and longstanding, and the couple must generally present

20   themselves to the public as husband and wife.  These attributes are buttressed by conduct

21   demonstrating a spousal relationship, e.g., commingling of assets, income and expenditures,

22   having children together, etc.

23   \\\\\

---

25   [17]  While the "separate residences" finding is implicit based on the weight of the evidence
     presented in Dela Cruz, neither the Board nor the court explicitly addressed whether such a
26   scenario meets the "cohabitation" requirement of the statute.  This court need not reach this issue
     under the facts presented herein.

1    Finally, as plaintiff notes, <u>Dela Cruz</u> also demonstrates that a "holding out" finding

2    may be appropriate even where there is conflicting evidence, e.g., the conflicting testimony of

3    third parties.  15 Vet. App. at 147-148.

4    With these considerations in mind, the court turns the facts presented herein.

5    D. <u>Facts</u>

6    The following facts are undisputed.  Defendant Lisa Bellecci (then Lisa Spinelli)

7    married U.S. Marine Christopher Bellecci on October 22, 1988.  On November 19, 1988,

8    Christopher Bellecci died in an accident during a training exercise at a Marine Corps Base

9    in Twenty-Nine Palms, California.  Following his death, Lisa Bellecci applied for and was

10   awarded Dependency and Indemnity Compensation benefits from the Veterans Administration.

11   Lehman Decl. at ¶ 2; Plaintiff's Undisputed Fact No. 1.  Bellecci received these benefits until

12   February 28, 2006.  Lehman Decl. at ¶ 10.

13   In 1992, Bellecci began living with Mark Petrie; they had four children together,

14   from 1994 to 2002.  Bellecci Deposition (July 30, 2002), at 10:1-3, 9:12-14 (Exh. A to Lehman

15   Decl.); Lehman Decl. at ¶¶ 3, 9, and Exh. D; First Farrell Decl. at ¶ 2; Plaintiff's Undisputed Facts

16   Nos. 2, 4, 7, 163.  Each of the couple's children was given the last name "Petrie," and Bellecci

17   signed three of her four children's birth certificates with the name "Petrie," specifically:  Dallas

18   Petrie, born 12/09/94, signed "Lisa A. Bellecci;" Lacie Petrie, born 10/15/98, signed "Lisa A.

19   Spinelli-Petrie; Marisa Petrie, born 07/30/01, signed "Lisa A. Petrie;" and Caylie Petrie, born

20   9/22/02, signed "Lisa A. Petrie."  Plaintiff's Undisputed Facts Nos. 3, 7, and 51(A); Exh. D to

21   Lehman Decl.; Second Farrell Decl. at ¶ 3(A).  On January 10, 2000, Bellecci signed a St. Basil

22   School kindergarten application for Dallas Petrie as "Lisa A. Petrie."  On March 29, 2004,

23   Bellecci signed a St. Basil School kindergarten application for Lacie Petrie as "Lisa Spinelli

24   Petrie."[18]  Cerna Decl. at Exh. A- 12.  Bellecci stated in deposition that her children's school

25

26       [18]  Bellecci does not dispute this fact but adds that she used the last name Petrie at her
children's school "[f]or simplicity and to help save face for the children."  Defendant's

18

1  refers to her by the last name "Spinelli-Petrie" (Bellecci Depo. at 27:1-5; Lehman Decl. at ¶ 4,

2  Plaintiff Undisputed Fact No. 4), but now disputes "the statement that the school attended by

3  Bellecci's children knew her by any specific [] name" (Defendant's Disputed Fact No.4).  Bellecci

4  used the following last names from 1997 to 2002:  Bellecci, Spinelli and Petri.  Bellecci Depo. at

5  25:23-25 - 26:1.  At her deposition on July 30, 2002, Bellecci testified that she owned a real estate

6  business and Mark Petri had worked at the business since receiving his license.  Bellecci Depo. at

7  10:4-12.

8           The United States now identifies the commencement of Bellecci's disqualification

9  for DIC benefits as February 14, 1997, the date Bellecci and Petrie together purchased real

10  property at 717 El Dorado Street, Vallejo, California.  The parties do not dispute that the Grant

11  Deed identifies defendant as "Lisa A. Petrie, an unmarried woman" (and Petrie as "an unmarried

12  man"), nor that defendants purchased the property as joint tenants.  See Defendant's Exh. 2-C

13  (Grant Deed for El Dorado Street property).  Nor do the parties dispute that Bellecci signed the

14  Grant Deed as "Lisa A. Petrie."[19]  Id.  The parties do dispute the significance of this transaction,

15  plaintiff asserting it unequivocally demonstrated the requisite "holding out" of the couple as

16  husband and wife, defendant asserting it emphatically and publicly demonstrated that she and

17  Petrie were not married.

18           In further support of her position, Bellecci has submitted grant deeds "for each

19  property in which Bellecci or Mark Petrie hold [or] has held title" to real property other than on El

20  Dorado Street.  These are:  342 East N Street, Benicia to Petrie, "an unmarried man;" 926 Georgia

21  Street, Vallejo, to Petrie, "an unmarried man;" 158 Terrybrook Lane, Vallejo, to Petrie, "an

22  ────────────────

23  Response, at p. 12.

24     [19]  However, until Bellecci provided a copy of the Grant Deed, the parties disputed
    whether Bellecci had signed the Deed Transfer Record (purchase deed) as "Lisa A. Petrie."  See
25  Lehman Decl. at ¶ 5, asserting Bellecci "signed" the record as "Lisa A. Petrie," a characterization
    disputed by Bellecci (Defendant's Disputed Fact No.5 ), and unresolvable by this court because
26  the entire document is typed (see Exh B to Lehman Decl.).

1   unmarried man;" and 157 Terrybrook Lane, to Bellecci, "an unmarried woman."  Defendant's

2   Disputed Fact Nos. 8 and 9; Exh. 2-B to Defendant's Memorandum.[20]

3            Bellecci has also submitted copies of her business license for Millennium Real

4   Estate Services, made out to "Lisa A. Bellecci" for the period August 1998 through June 2001,

5   and to "Lisa A. Bellecci" and co-owner Kathryn Gi from August 2002 to June 2004.  A May 8,

6   2007 account invoice identifies Mark Petrie and "Lisa A. Spinelli" as co-owners, which defendant

7   asserts became effective that day.  Exh. 2-B to Defendant's Memorandum.

8            The El Dorado Street property contains fourteen living units.  Defendants placed a

9   deposit on the property in December 1996, signing the Purchase Contract as "Mark Petrie" and

10  "Lisa A. Petrie," and obtaining a deposit receipt made out to "Mark and Lisa Petrie."  Cerna Decl.,

11  Exh. A-1.  Defendants sold the property in Spring 2000, defendant signing various documents in

12  April and May as "Lisa A. Petrie," or "Lisa A. Bellecci."  Ibid.

13           Billings associated with the El Dorado Street property, which defendant does not

14  dispute, include the following: (1) Terminix, dated January 22, 1998, addressed to "Lisa Petrie"

15  (Cerna Decl., Exh. A-2); (2) PG&E, dated February 1998, April 1998, January 1999 (and late

16  note, June 2000) addressed to Mark Petrie/Lisa Petrie (id., Exh. A-3); (3) City of Vallejo, for

17  water bills covering periods April 29, 1998 to July 6, 1998, January 10, 2000 to March 14, 2000,

18  and May 9, 2000 to July 3, 2000, addressed to, inter alia, "Petrie Apartments, c/o Lisa and Mark

19  Petrie" (id., Exh. A-4); and (4) Vallejo Garbage Service addressed a bill dated June 21, 2000 for

20  717/725 El Dorado Street to "Lisa and Mark Petrie" (id. at Exh. A-14).  See Plaintiff's

21  Undisputed Facts Nos. 18, 19 and 20.

22           In addition, the following financial transactions appear to reflect the sale or

23  impending sale of the El Dorado Street property: (1)  A Fidelity National Title Company Seller

24  statement of actual settlement costs describes the sellers of 717-719-721 El Dorado Avenue,

25

26       [20]  Bellecci also lists "1308 Ryder Street" as property she or Petrie held separately, but
does not provide documentation.  Defendant's Memorandum, at p. 3.

1   Vallejo, California, as "Mark A Petrie and Lisa A Petrie," with a settlement date of June 23, 2000,

2   and a Fidelity National Title Company Seller Final Closing Statement describes the sellers of

3   717-719-721 El Dorado Avenue, Vallejo, California, as "Mark A. Petrie and Lisa A. Petrie," with

4   a closing date of June 23, 2000 (id. at Exh. A-15), and (2)  Wynwood Agency of California, Inc.,

5   addressed a letter dated January 17, 2000 to "Mark A and Lisa A Petrie," indicating that Contract

6   Service Center would process payments on a contract and verifying a new account listing "Mark

7   A and Lisa A Petrie" as payors[21] (id. at Exh. A-13).  See Plaintiff's Undisputed Facts Nos. 31 and

8   29.

9          Defendant does not dispute the authenticity of these documents, but discounts their

10  reference to her as "Petrie" because they "arose out the purchase of the El Dorado Street

11  property."  Defendant's Response to Plaintiff's Undisputed Facts No. 18-20, 29-31.

12         Nor does defendant dispute the following billing statements, invoices, notices,

13  receipts and business transactions, dated 1998 to 2006 and submitted by plaintiff, although she

14  states that most "arose out of the purchase of the El Dorado Street Property."  See Defendant's

15  Response, at pp. 9-17; Plaintiff's Undisputed Facts Nos. 21 through 27, 32-39, 43 through 50.

16  These undisputed facts are:

17  21.  Vallejo City Floral Company addressed a statement dated October 3, 1998 to "Lisa
    Petrie."  Id. at Exh A-5.
18

19  22.  Rodgers Bottling Company addressed a statement dated October 31, 1998 to "Lisa Petrie."
    Id. at Exh A-6.

20  23. Homes and Land addressed a magazine subscription statement dated November 23, 1998 to
    "Anne Stanton/Lisa Petrie" at Millenium Realty.  Id. at Exh. A-7.
21

22  24.  Nextel Communications addressed an invoice on an unknown day in 1998 to "Mark and Lisa
    Petrie."[22] Id. at Exh. A-8.

23

24         [21] Bellecci does not dispute this fact but adds:  "This agency was a processing agency that
    was employed to maintain the mortgage on El Dorado [S]treet."  Defendant's Response, at p. 12.
25

26         [22] Bellecci does not dispute this fact but qualifies it as follows: "[T]his Nextel account
    was established by Mark Petrie and Lisa's name was added on."  Defendant's Response, at p. 11.

25. Vallejo Glass Company addressed an invoice dated February 26, 1999 to "Lisa Petrie" and Bellecci signed the invoice as "Lisa Petrie." Id. at Exh. A-9.

26. Vallejo Stationers addressed a statement dated May 30, 1999 to "Millennium Realty, c/o Lisa Petrie." Id. at Exh. A-10.

27. Whitney Bowes addressed an invoice for the period of September 9, 1999 to October 8, 1999 to "Millennium Real Estate Services . . . Lisa Petrie." Id. at Exh. A-11.

*********************

32. The Vallejo Chamber of Commerce addressed a statement dated September 5, 2000 to "Lisa Petrie." Id. at Exh. A-16.

33.  Danone Waters of North America, Inc., addressed a bill for the period of December 20, 2000 to January 19, 2001 to "Lisa Petrie." Id. at Exh. A-17.

34.  State Farm Automobile Insurance Company addressed a notice of payment on a claim dated April 18, 2001 to "Lisa and Mark Petrie."[23] Id. at Exh. A-18.

35.  Capital One addressed a credit bill dated May 10, 2001 to "Lisa Petrie." Id. at Exh. A-19.

36.  Charles Schwab prepared an account statement listing "Mark A Petrie and Lisa A Petrie" as joint tenants for January 1, 2002 to March 31, 2002.  The form indicates the account opened in 2000.  Charles Schwab also prepared a 1099 form listing "Mark A Petrie" and "Lisa A Petrie" as joint tenants on January 18, 2002.[24] Id. at Exh. A-20.

37.  Jackson National Life Insurance Company addressed a grace period notice dated February 24, 2002 to "Lisa A Petrie." Id. at Exh. A-21.

38.  On October 16, 2002, Bellecci applied for Mark Petrie to be added to two Wells Fargo accounts, numbered 1630546511 and 1630546529.  Id. at Exh. A.

39.  A letter from the Reserve Police Officers Association dated November 6, 2002 thanked "Lisa Petrie" for pledging fifty dollars.  Another letter from the Reserve Police Officers Association dated November 30, 2004 thanked "Lisa Petrie" for pledging ten dollars. Id. at Exh. A-23.

43.  Bellecci signed a Vallejo Boat Works invoice dated June 2, 2004 as "Lisa Petrie."  Id. at Exh. A-24.

---

[23]    Bellecci does not dispute this fact but states: "[T]his company [] held the insurance for 717 and El Dorado St."  Defendant's Response, at p. 14.

[24]    Bellecci does not dispute this fact but qualifies it as follows:  "The monies establishing this account were wired directly from the escrow company in the name of Mark A. Petrie and Lisa A. Petrie and the difficulty in ca[s]hing [] such a large amount made out to a fictitious name [] [w]as going to be impossible [] [u]nless we were to open an account in the name[] [t]hat was on the wire or paper check."  Defendant's Response, at p. 14.

44.  Columbus Parkway Self Storage addressed a late notice dated June 11, 2004 to "Lisa Spinelli-Petrie."  Id. at Exh. A-25.

45.  Acme and Sons Sanitation, Inc., addressed two invoices dated July 9, 2004 and December 14, 2005, for 157 Terrybrook Lane to "Lisa Petrie."  Id. at Exh. A-26.

46.  East Bay Vivarium filled out a customer order dated November 23, 2004 for "Lisa Petrie."[25] Id. at Exh. A-27.

47.  Central Self-Storage addressed a receipt dated November 23, 2004 to "Lisa Spinelli-Petrie." Id. at Exh. A-28.

48.  Muscle and Fitness addressed a September, 2005 magazine to "Lisa S. Petrie."  Id. at Exh. A-29.

49.  White's Chem-Dry addressed a bill dated September 2, 2005 to "Mark and Lisa Petrie."[26]  Id. at Exh. A-30.

50.  Golf Digest magazine addressed a January 2006 magazine to "Lisa Spirelli[sic]-Petrie."  Id. at Exh. A-31.

        While acknowledging the above facts, defendant has submitted substantial

documentation in support of her position that she nonetheless remained publicly known as

"Bellecci."  Although plaintiff has not acknowledged these documents, they have been

authenticated by defendant in her declaration, and are therefore considered by the court.  These

documents are as follows:

1.  Mark Petri's 1996 federal income tax return, wherein he filed single status.  Defendant's Memorandum, Exh. 2-F.

2.  Lisa Bellecci's 1996 federal income tax return, wherein she filed single status.  Defendant's Memorandum, Exh. 2-G.

3.  August 29, 2005 receipt from Big Bay RV Storage, made out to "Lisa Bellecci."  Id. at Exh. 2-H.

4.  2006 renewal notice from Sports Illustrated Kids, addressed to "The Bellecci Family."  Id. at Exh. 2-I.

---

[25]  While Bellecci does not dispute this fact, she qualifies it as follows:  "[T]his bill was for a birthday party for Dallas Petrie.  When the defendant ordered the party on the phone she gave her name only as Lisa."  Defendant's Response, at p. 16.

[26]  Defendant omitted reference to this fact proffered by plaintiff (see Defendant's Response, at p. 17), and the court construes this concrete billing statement as undisputed.

5.  May 23, 2005 closing statement from Alliance Title Company, for "Lisa A. Bellecci." <u>Id</u>. at Exh. 2-J.

6.  Pier 1 Imports cardholder statement dated September 2, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-L.

7.  AmeriCredit billing statement dated September 5, 2005, addressed to "Lisa A. Bellecci." <u>Id</u>. at Exh. 2-M.

8.  Countrywide Home Loan statement dated December 9, 2005, addressed to "Lisa A. Bellecci." <u>Id</u>. at Exh. 2-N.

9.  Billing statement from Vallejo Sanitation and Flood Control District, dated Decembeer 23, 2005, addressed to "Lisa A. Bellecci." <u>Id</u>. at Exh. 2-O.

10.  Western Union payment receipt for wire transfer to AmeriCredit, dated December 17, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-P.

11.  City of Vallejo Municipal Services Bill, dated December 23, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-Q.

12.  Culligan billing statement dated November 25, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-R.

13.  First National Bank of Marin credit card statement dated June 8, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-S.

14.  Western Union payment receipt for wire transfer to Option One Mortgage, dated August 16, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-T.

15.  Dell Preferred Account statement dated August 3, 2005, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-U.

16.  Spiegel credit card statement dated August 7, 2003, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-V.

17.  Prudential Mortgage Bankers billing notice dated April 14, 2003, addressed to "Bellecci, Lisa." <u>Id</u>. at Exh. 2-W.

18.  Comcast billing statement dated January 2, 2006, addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-X.

19.  Spiegel credit card statement, date not apparent (defendant states it is dated December 8, 2000 (see Defendant's Memorandum, at p. 6), addressed to "Lisa Bellecci." <u>Id</u>. at Exh. 2-Y.

20.  Wells Fargo banking statement, dated December 21, 2000, addressed to "Lisa A. Bellecci." <u>Id</u>. at Exh. 2-Z.

21.  Orchard Bank statement, date not apparent (defendant states it is dated May 15, 2001 (see Defendant's Memorandum, at p. 6), addressed to "Lisa A. Bellecci." <u>Id</u>. at Exh. 3-A.

22.  Three October 2005 checks made out to "Lisa Bellecci."  <u>Id</u>. at Exh. 3-B.

23.  Two October 2005 checks made out to "Lisa Bellecci" and "Bellecci Lisa."  <u>Id</u>. at Exh. 3-C.

24.  Mark Petri's 2005 federal income tax return, wherein he filed "head of household," listing the couple's four children as dependents.  <u>Id</u>. at Exh. 3-D.

25.  Wells Fargo official drafted check from the account of "Lisa Bellecci."  <u>Id</u>. at Exh. 3-E.

26.  Land/Home Financial Services Account QuickReport dated May 31, 1999, for "Lisa Bellecci."  <u>Id</u>. at Exh. 3-F.

27.  IBSC Insurance Services letter regarding refund to "Lisa Bellecci."  <u>Id</u>. at Exh. 3-G.

28.  Office Max transaction record dated January 17, 1999, made out to "Lisa Bellecci."  <u>Id</u>. at Exh. 3-H.

29.  PG&E bill dated August 5, 2005, addressed to "Lisa Bellecci."  <u>Id</u>. at Exh. 3-I.

30.  Option One Mortgage statement dated July 2004, addressed to "Lisa A. Bellecci."  <u>Id</u>. at Exh. 3-J.

31.  Sports Illustrated Kids subscription statement addressed to "The Bellecci Family."  <u>Id</u>. at Exh. 3-K.

32.  Crossland Mortgage Corp. statement dated November 23, 1998, addressed to "Lisa A. Bellecci."  <u>Id</u>. at Exh. 3-L.

33.  First National Bank undated (defendant states it is dated June 2001, Defendant's Memorandum, at p. 7), addressed to "Lisa Bellecci."  <u>Id</u>. at Exh. 3-M.

34.  Steve Padis Jewelry Plus Enterprises receipt dated July 1, 1998 and made out to "Lisa Bellecci and Mark Petrie."  <u>Id</u>. at Exh. 3-N.

The remainder of plaintiff's case rests on the fact "that Bellecci endorsed a check under the name "Lisa Petrie" (adding 'legal name Bellecci') on January 22, 2001 [and] . . . cashed two checks made out to "Lisa Petrie," one on January 8, 2002 and the other on February 6, 2002." Plaintiff's Fact Nos. 6, 51-F and 51-G; Lehman Decl. at ¶ 6 and Exh. C; see also Second Farrell Decl. at ¶¶ 3(E) and (F).

Defendant responds that the first of these checks, dated January 22, 2001, contains "an apparent notation made by [] a bank employee who knows Lisa as Lisa Bellecci." Defendant's Disputed Fact No. 6.  This representation is supported by the notation following defendant's signature but in different handwriting that provides, "Legal name Bellecci."  Exh. C

to Lehman Decl.  Defendant disputes the remaining two checks as follows:  "Whether or not the checks dated January 22, and February 5 were made by direct deposits into Bellecci's account by Jodie Arnold [client making mortgage payment], these checks were never seen nor touched by defendant Bellecci as is shown by the printed numbers on the back of the check.  This indicates this is a South Lake Tahoe branch of Wells Fargo of a notation on the back of . . ." [sic].  Defendant's Disputed Fact No. 6.  Defendant has submitted a Branch Profile of the South Lake Tahoe branch.  Defendant's Memorandum, Exh. 2-D.  However, because the numerical designations on the backs of these checks are illegible, the court is unable to make the requested match.

In response to defendant's arguments, the United States now asserts only that "Bellecci does not seem to deny endorsing the first check," and "she does not dispute that they [the second and third checks] were written to her in the name Lisa Petrie and cashed into her account."  Reply, at ¶ 6.

E. <u>Analysis</u>

Most of the foregoing facts are undisputed; the parties dispute their significance.  Most significant to this court is the undisputed fact that the couple have four children, all given the last name "Petrie," and that Bellecci signed her own name as "Petrie" on the birth certificates of the couple's three oldest children, the first of these on October 15, 1998.  The birth of the couple's first child, on December 9, 1994, is also significant, even though defendant signed her name on the birth certificate as "Bellecci;" since many of today's spouses retain separate last names, it is reasonable to infer the new parents presented themselves, and were perceived, as married or at least in a marital-type relationship.  Since the "holding out" bar may be met by a cohabiting couple that does not have children, the fact that defendants both lived together and had several children is highly probative in demonstrating a marital-type relationship.

Plaintiff's reliance on defendants' 1997 joint purchase of the El Dorado Street property is somewhat contrived, given the couple's express designations on the grant deed as

"unmarried."  The property contained multiple units and did not, apparently, become the family home.  The property was sold within three years, indicating it was simply a joint investment entered into by real estate professionals.  Although the purchase of real property in joint tenancy is commonly associated with married couples, it is not exclusively so.  Moreover, like many of the other examples in this case, Bellecci relied interchangeably on "Bellecci" and "Petri" when the property was sold.

On the other hand, the purchase of the El Dorado Street property may reasonably be construed as a turning point in the couple's more general "holding out" to the community. Despite the "unmarried" designations on the grant deed, the property was known as the "Petri Apartments" and local public entities and private businesses provided services to, and billed, defendants as "Mark and Lisa Petrie."  The couple had a two-year-old child when they bought the property in joint tenancy and within the next twenty months they had a second child.  Fifteen months later, Bellecci referred to herself as "Petri" in a kindergarten application for the couple's oldest child.

This evidence supports plaintiff's position that as of February 14, 1997, the couple routinely presented themselves to their community as married.  The principal exceptions – close friends and relatives to whom they stated they "could not" get married in order to preserve Bellecci's benefits and as reflect on some, but not all, legal documents – do not defeat this inference.  The court's finding is made pursuant to the guidelines articulated in Dela Cruz, specifically, that the court may weigh conflicting evidence, rely on that which is "more credible and persuasive," and make findings "consistent with the overall version of events. . . " Dela Cruz, 15 Vet. App. at 147.

The court finds plaintiff's emphasis on Bellecci's 2001 and 2002 checks unhelpful. More significant is the evidence submitted by plaintiff demonstrating the couple maintained joint banking accounts in 2002.  See Plaintiff's Undisputed Facts Nos. 36 and 38.

\\\\\\

1    Bellecci's documents raise more questions than they resolve.  For example, how

2  did the parties designate themselves on income tax returns filed 1997 to the present, with the

3  exception of Mark Petri's 2005 federal income tax return, wherein he filed "head of household,"

4  listing the couple's four children as dependents (Defendant's Exh. 3-D)?  Most of Bellecci's

5  documents are dated 2005, well past the time period at issue.  Defendant's documents

6  demonstrate only that she maintained some individual accounts and made some business

7  transactions using the name "Bellecci."  Defendant's evidence, in combination with plaintiff's,

8  demonstrates little more than defendant interchangeably used the last names Bellecci, Petri, and

9  Spinelli.

10    However, the fatal flaw in the United States' motion is that although the

11  documentation submitted by both sides sets forth undisputed facts, the inferences to be drawn

12  from such facts remain disputed.   Moreover, the documents themselves may not tell the entire

13  story; the trial court may well wish explanatory testimony to be given so that the inference to be

14  drawn from a particular fact (document) is based on a complete record.  As such, some inferences

15  may depend on credibility determinations.  While the court could easily find that the evidence

16  applied to the law thus far favors the position of the United States at present, if the undersigned

17  were permitted to make findings on the correct inferences, the court cannot find that the

18  inferences to be drawn may be seen as a matter of law in only one way by the trier of fact.  And, it

19  is immaterial that there may be no jury trial on the underlying claims and that the trial judge on

20  summary judgment is the same as the trial judge at court trial.  The trial judge is as bound by Rule

21  56 strictures in a non-jury matter as the judge is bound in a matter which would surely go before a

22  jury.  Griffith v. Utah Power and Light Co., 226 F.2d 661, 669 (9th Cir. 1955).

23    V. CONCLUSION

24    For the foregoing reasons, IT IS HEREBY RECOMMENDED that partial

25  summary judgment be denied on behalf of plaintiff United States (Docket No. 41), on its third

26  \\\\\

28

and fourth causes of action only (mistake of fact and unjust enrichment).  The action is also subject to a trial on defendant Bellecci's affirmative defenses.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, plaintiff may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 03/25/08                                      /s/ Gregory G. Hollows
                                                     _____
                                                     GREGORY G. HOLLOWS
                                                     U. S. MAGISTRATE JUDGE

GGH5:Bellecci1538.f&r